## MASTER AFFIDAVIT

I, Brian D. Devine, being duly sworn state the following:

(1)     I am a Senior Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement (ICE). I am currently assigned to the Assistant Special Agent-in-Charge (ASAC), Orlando, Florida, Office. My present duties include, but are not limited to, conducting criminal investigations into violations of federal laws relating to immigration and smuggling, as well as conducting criminal investigations involving financial and document fraud. I have been a Special Agent with ICE since its inception in March 2003. Prior to that, I was employed by its predecessor agency, Immigration and Naturalization Service (INS), beginning July 12, 1999, as a United States Border Patrol Agent. I later became an INS Special Agent on November 17, 2002.

(2)     In my current capacity as an ICE Special Agent, I have participated in numerous investigations, in which I have conducted physical and electronic surveillance, executed search warrants, reviewed voluminous bank records, and analyzed complex financial transactions.

(3)     I have personally assisted in the development of this investigation, which is the subject of this affidavit; and, therefore, I am familiar with the facts and circumstances outlined below. The facts and information contained in this affidavit are based upon my personal knowledge derived from my overall participation in this investigation, details that have been relayed by various agencies, reviews of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein (including

1

participants), and information gained through my training and experience and the training and experience of others.

(4)     In addition, I make this affidavit based upon information from visa petitions received by your affiant from United States Citizenship and Immigration Service (CIS), information and labor applications received from Department of Labor (DOL), visa information and petitions received from the United States Department of State, Diplomatic Security Service (DOS/DSS), information obtained through confidential informants, information received through other various databases, and information found on the World Wide Web. Because this affidavit is being submitted for the limited purposes of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit.

(5)     This affidavit is being submitted for the limited purpose of supporting the civil forfeiture complaint against the defendant properties.

## I. OVERVIEW

(6)  ·  "VR Services" is a conglomerate that is comprised of a total of 11 smaller "shell" subsidiary companies, which exist in support and furtherance of the overall conglomerate.     The "shell" subsidiary companies include: 1) VR High Quality Corporation; 2) EPCO People Employment Corporation; 3) Travel Work Study Overseas, Inc.; 4) Fourth Millennium Corporation; 5) CD Quality Service Corporation; 6) RV Quality Services, Inc.; 7) WB Improvements, Inc.; 8) Crystal Diamond, Inc.; 9) Very Reliable Services, Inc.; 10) MLE Management Services, Inc.; and 11) Ocean Star Services Corporation.

2

(7)     Under the laws and regulations of the United States, foreign nationals are not permitted to lawfully work in the United States unless they obtain prior employment authorization from the United States Government.  One lawful means by which foreign nationals can obtain employment authorization is through a nonimmigrant employment visa known as an "H-2B visa."  An H-2B visa authorizes foreign nationals to work in the United States temporarily to perform nonagricultural services or labor for a United States employer.  Typically, an H-2B visa is utilized for job positions in the hospitality industry, including room attendants and food servers.  However, an H2-B visa may not be issued if it will result in displacing United States workers capable of performing such services or labor.

(8)     Queries of various ICE indices revealed that since 2006, VR Services submitted materially false documentation, through its numerous shell companies, to the DOL, CIS, and the DOS/DSS, which resulted in the fraudulent approval of over 1,000 employment-based H-2B visas.  This has improperly allowed the same number of foreign nationals to enter into and/or remain in the United States as temporary laborers. Essentially, VR Services has engaged in a large-scale fraudulent scheme, in which it submits H-2B visa petitions that falsely represent that there has been a change of employer when, in fact, the "new" employer is simply a different one of the shell subsidiary companies that are part of the VR Services conglomerate.

(9)     VR Services uses beneficiaries from its fraudulently obtained H-2B visa petitions to supply its labor pool with cheaper, full-time foreign labor, instead of hiring more costly United States workers.  H-2B workers work at locations other than the location designated on the DOL applications and approved CIS I-129 petitions.

3

Additionally, VR Services employs foreign nationals who are not authorized to work in the United States. These individuals consist mainly of visa overstays and aliens who were not inspected at entry. It appears that VR Services employs these individuals as so-called "independent contractors." All of this is done in violation of the laws and regulations governing the H-2B visa program and employment of foreign workers.

(10)   VR Services solicits hotels and restaurants in the United States claiming that it has a labor pool of several hundred people who are eligible to work in the United States. In promoting its services to the hotels, VR Services promises clients it will comply with all pertinent labor and immigration laws, it will pay all relative employment taxes,[1] and it will carry proper insurance coverage. Thus, in using VR Services' contract labor workforce, the hotels' obligations towards the above concerns are effectively eliminated. Trash pulls conducted during this investigation, as well as the execution of a federal search warrant executed at the business location of VR Services, revealed that VR Services actively solicits hotels nationwide in an effort to sell its labor force.

(11)   VR Services supplies foreign national workers to more than 100 clients in the hotel industry throughout the United States. Based on a review of financial records, it appears that VR Services generates more than $300,000 in gross weekly receipts as a result of this fraudulent scheme.

---

[1] "Employment taxes" include federal withholding income taxes, Social Security taxes, Medicare taxes, and federal unemployment taxes.

4

## II. RELEVANT CORPORATIONS[2]

*a.*     ***VR High Quality Service Corporation (VR High Quality)***

(12)     VR High Quality is located at 7468 Universal Boulevard, Orlando, Florida 32819. VR High Quality was incorporated in Florida on March 22, 2001, under the address of 5840 Donnelly Circle, Orlando, Florida 32821. This company was incorporated listing Valquiria Dozzi (Dozzi) as the President, and Rodrigo Calza (Calza) as the Secretary. In 2002, the address was changed to 7468 Universal Boulevard, Orlando, Florida 32819. In 2003, Valeria Dozzi Barbugli (V. Barbugli) was added to the list of corporate officers as the Vice-President of the company. This company was voluntarily dissolved on May 24, 2004.

*b.*     ***EPCO People Employment Corporation (EPCO)***

(13)     EPCO is located at 7512 Dr. Phillips Boulevard, 50-192, Orlando, Florida 32819. EPCO was incorporated in Florida by Valmir Nazario on May 30, 2006, under the address of 5850 Lakehurst Drive, Suite 270-1, Orlando, Florida 32819. It appears that Dozzi took over the company in 2007, changed its location, and is currently the President and Director.

*c.*     ***Travel Work Study Overseas, Inc. (TWSO)***

(14)     TWSO is located at 7536 Universal Boulevard, Orlando, Florida 32819. TWSO was incorporated in Florida by Andres Astrauskas (Astrauskas) on September 27, 2006, under the address of 1961 Port Castle Circle, Winter Garden, Florida 34787. In 2008, the principal business location of TWSO was changed to 7536 Universal

---

[2] Throughout this affidavit, unless specifically stated by name, the companies and individuals described in sub-paragraphs (a-p) shall be referred collaboratively under the conglomerate of VR Services.

Boulevard, Orlando, Florida 32819. The current officers of the corporation are

Astrauskas, the President, and Eduardo Barbugli (E. Barbugli), the Director.

**d.** **_Fourth Millennium Corporation (Fourth Millennium)_**

(15) Fourth Millennium is located at 7536 Universal Boulevard, Orlando,

Florida 32819. Fourth Millennium was incorporated in Florida by Samuel Luize Sarza

on November 22, 2005, under the address of 7476 Universal Boulevard, Orlando,

Florida 32819. It appears that E. Barbugli became the President of the company in

2007, and moved its location to 7536 Universal Boulevard, Orlando, Florida 32819.

There have been several officers throughout the existence of this company. However,

at the time of the company's dissolution on April 23, 2009, E. Barbugli was listed as the

President and V. Barbugli was the Director.

**e.** **_CD Quality Service Corporation (CD Quality)_**

(16) CD Quality is located at 7536 Universal Boulevard, Orlando, Florida

32819. CD Quality was incorporated in Florida by Dozzi and Calza on January 9, 2004,

under the address of 7468 Universal Boulevard, Orlando, FL 32819. In 2005, V.

Barbugli was named Vice- President, but she later resigned in 2009. In July 2009,

Calza also resigned from the company, which left Dozzi as the only officer. On August

1, 2009, Dozzi changed the principal business address to 7536 Universal Boulevard,

Orlando, Florida 32819.

**f.** **_WB Improvements, Inc. (WB Improvements)_**

(17) WB Improvements is located at 2832 Ripton Court, Orlando, Florida

32835. WB Improvements was incorporated in Florida by E. Barbugli under the address

of 1061 South Hiawassee, Suite 172, Orlando, Florida 32835. At the time of

6

incorporation, E. Barbugli was listed as the President and Wilson Barbugli (W. Barbugli) as the Vice-President. On September 2, 2004, Calza was added to the list of corporate officers as Director. The address was changed by W. Barbugli to 2832 Ripton Court, Orlando, Florida 32835. Currently, W. Barbugli is the only corporate officer remaining in the company.

### g.    Crystal Diamond, Inc. (Crystal Diamond)

(18)    Crystal Diamond is located at 5298 Bay Side Drive, Orlando, Florida 32819. Crystal Diamond was incorporated in Florida on November 9, 2006, by Maria De Souza under the address of 12512 Butler Bay Court, Windermere, Florida 34786. The initial incorporation documents were notarized by V. Barbugli. On February 7, 2008, the principal place of business was changed to 5298 Bay Side Drive, Orlando, Florida 32819. The principal place of business was changed a second time on June 1, 2009, to 7536 Universal Boulevard, Orlando, Florida 32819. This company was voluntarily dissolved on July 13, 2009.

### h.    Very Reliable Services, Inc. (Very Reliable)

(19)    Very Reliable is located at 2040 Port Castle Circle, Winter Garden, Florida 34787. Very Reliable was incorporated in Florida by E. Barbugli on November 7, 2006. On June 4, 2009, the principal place of business was changed to 2425 East Commercial Boulevard, Suite 203A, Fort Lauderdale, Florida 33308. On October 8, 2009, E. Barbugli was removed from the corporate officer list, and replaced with Luiz Batalha as Director of the company and most recently, Luiz Batalha was removed as Director and replaced by Dozzi.

*i.*     ***Ocean Star Services Corporation (Ocean Star)***

(20)   Ocean Star is located at 4997 Cason Cove Drive, Apartment 135, Orlando, Florida 32811.  Ocean Star was incorporated in Florida by Ruben D. Toro on June 5, 2009, using address 4997 Cason Cove Drive, Apartment 135, Orlando, Florida 32811.  Since its inception, the Registered Agent and President of the company has been Fernando C. Aguiar.  Aguiar was deported from the United States to Brazil in October 2009.

## III. <u>RELEVANT INDIVIDUALS</u>

*j.*     ***Valquiria Dozzi (Dozzi)***

(21)   Dozzi, a/k/a Valquiria D. Batalha, a/k/a Valquiria Dozzi Calza, was born on January 11, 1956.  Dozzi is a citizen and national of Brazil, and is currently in the United States as a Lawful Permanent Resident (LPR) based on her marriage to another LPR. Dozzi's assigned Alien File (A-file) is AXX XXX 817.  Dozzi is the head of the criminal enterprise.  Dozzi is currently, or at one time was, listed in the corporate documents as the President or Director of the following shell subsidiary companies: 1) VR High Quality; 2) EPCO; 3) CD Quality; 4) RV Quality; and 5) Very Reliable.  Since 2006, Dozzi has utilized her family members and the various shell subsidiary companies she controls to submit more than 50 H-2B visa petitions to CIS, resulting in more than 1,000 foreign nationals working in the United States fraudulently.

*k.*     ***Valeria Dozzi Barbugli (V. Barbugli)***

(22)   V. Barbugli was born on March 28, 1953, and is the sister of Dozzi.  V. Barbugli is also a citizen and national of Brazil, and is currently in the United States as an LPR based upon an approved Immigrant Petition for Alien Worker (Form I-140), and

an approved Application to Register Permanent Residence (Form I-485).  V. Barbugli's form I-140 was submitted to CIS by Dozzi, and was approved based on her position as an Office Manager for CD Quality, d/b/a VR High Quality.  V. Barbugli is the Vice-President of VR High Quality, Director of Fourth Millennium, and the Director of VR Labor Corporation.

**l.      *Wilson Barbugli (W. Barbugli)***

(23)    W. Barbugli was born on May 26, 1947, and is the husband of V. Barbugli. W. Barbugli is also a citizen and national of Brazil, and is currently in the United States as a LPR based on his marriage to V. Barbugli.  W. Barbugli is the President of WB Improvements.

**m.      *Eduardo Barbugli (E. Barbugli)***

(24)    E. Barbugli was born on July 20, 1979, and is the son of V. Barbugli and W. Barbugli.  E. Barbugli is also a citizen and national of Brazil, and is currently in the United States illegally.  E. Barbugli is presently in administrative removal proceedings under the jurisdiction of an Immigration Judge.  At one time, E. Barbugli was the President of Fourth Millennium, and the Director for TWSO.

**n.      *Rodrigo Calza (Calza)***

(25)    Calza was born on October 16, 1975, and is the son of Dozzi, and the nephew of V. Barbugli and W. Barbugli.  Calza is also a citizen and national of Brazil, and is not believed to be in the United States.  In 2002, Calza attempted to enter the United States at a port of entry in Texas claiming that he was a United States citizen born in Orlando, Florida.   However, further investigation by immigration officials revealed that Calza was actually a citizen and national of Brazil.  Consequently, Calza

was found to be inadmissible at entry, and was excluded/removed from the United States for falsely claiming to be a United States citizen. In 2008, Calza attempted to enter the United States from Italy under the Visa Waiver program. Consequently, Calza was refused entry into the United States for the second time, and processed as a Visa Waiver Refusal. Presently, Calza has no legal immigration status in the United States. Calza is, or at one time was, listed as the Vice-President of VR High Quality.

### o.    *Rafaela Dutra Toro (Toro)*

(26)    Toro was born on October 6, 1981. Toro is also a citizen and national of Brazil, and is currently in the United States as an LPR based upon an approved marriage-based petition. After a review of applications and petitions submitted to DOL and CIS by TWSO, it shows that Toro is listed as a Representative and Assistant Director of TWSO.

### p.    *Andres Astrauskas (Astrauskas)*

(27)    Astrauskas was born on August 17, 1977. Astrauskas is a citizen and national of Colombia who entered the United States under an "F-1" nonimmigrant visa (academic student visa) to attend college. Astrauskas resided in the United States despite the termination of his visa, which resulted because of his failure to adhere to the academic student visa requirements. Astrauskas departed the United States sometime in late 2009 traveling to Columbia and is currently not in the United States. Astrauskas is the Director of TWSO.

## IV. THE H-2B NONIMMIGRANT VISA (TEMPORARY WORK VISA)

(28)    An H-2B visa is a nonimmigrant visa granted to foreign nationals who seek to work in the United States on a temporary basis. The H-2B nonimmigrant visa

program permits employers to hire foreign workers to work in the United States to perform temporary nonagricultural services or labor on a one-time, seasonal, peak-load, or intermittent basis.  The job must be temporary in nature (for one year or less).  The employer's need cannot be ongoing or continuous.

(29)    The application process is initiated by the employer who must establish the facts necessary to support a finding of its temporary need.  The annual H-2B limit set by Congress per fiscal year is 66,000. However, this numerical restriction does not apply to returning H-2B workers (extensions).  While such workers are exempted from this numerical limitation, employers are still required to file an H-2B application with the DOL for any H-2B returning (extension) workers.

(30)    In order to obtain an H-2B visa for foreign workers, the employer must first apply for and receive certification from DOL. Prior to January 18, 2009, the form utilized was the Application for Alien Certification (ETA-750).  The ETA-750 was filed by the prospective employer with a state workforce agency in the state where the work was to be performed. The state workforce agency reviewed the ETA-750 for completeness, ensured that the employer was offering the prevailing wage for the job, and oversaw any advertising the employer might be required to do as part of the labor certification process. After the ETA-750 was reviewed by the state workforce agency, it was forwarded to DOL for consideration and certification. If DOL certified the ETA-750, then DOL would issue a certification stamp that contained the signature of the certifying DOL officer and a final determination letter.

(31)    The ETA-750 and the H-2B application process have since been revised in order to address the vulnerability for fraud. The revised form requires additional

11

information and contains more specific declarations. As of January 18, 2009, the form utilized to apply for temporary employment certification is known as the ETA-9142. The ETA-9142 sets forth the employer's name, address, Federal Tax Identification Number, the worksite location(s), the job title, the total number of worker positions needed, the rate of pay, and the dates of employment. Unlike the ETA-750, the ETA-9142 is not forwarded to a state workforce agency. The prospective employer now submits the ETA-9142 and supporting documentation directly to DOL for review and certification.

(32)   There are also additional eligibility requirements for employers to certify on the new ETA-9142. Employers cannot seek or receive payments of any kind from the employee for any activity related to obtaining labor certification, including payment of the employer's attorney fees, application fees, or recruitment costs. *See* Department of Labor Temporary Employment of Aliens in the United States Rule, 20 C.F.R. § 655.22. Employers will not place any H-2B workers outside the area of intended employment specified on the ETA-9142 unless the employer has obtained a new temporary labor certification from DOL. *See* Rule, 20 C.F.R. § 655.22(k)(2). If the application is being filed as a job contractor, the employer will not place any H-2B workers with any other employer or at any other employer's worksite unless:  1) the employer applicant makes a bona fide inquiry as to whether the other employer has or intends to displace United States workers within the area of intended employment; and 2) all worksites are listed on the certified Application for Temporary Employment Certification.

(33)   The ETA-750 and ETA-9142 contain signature blocks that require the prospective employer to sign under penalty of perjury that the information contained within the form is true and accurate. For the purposes of this affidavit, the ETA-750 and

12

ETA-9142 will hereinafter be collectively referred to as the "ETA Application."

(34)   When filling out the ETA Application, it is not always necessary for the employer to name each H-2B temporary alien worker it wants to employ.  An employer may submit a request for multiple unnamed foreign workers, as long as each worker is to perform the same services or labor, on the same terms and conditions, in the same occupation.  DOL certification is issued to the employer, not the worker, and is not transferable from one employer to another or from one job position to another.

(35)   The employer must also describe in detail, efforts to recruit qualified United States workers for the job opportunity, and the results of those efforts. The ETA Application must be completed and signed under penalty of perjury by the prospective employer wherein the employer promises to comply with DOL regulations governing the hiring, employment, and retention of those for whom an H-2B visa is sought.[3]

(36)   The H-2B employer is required to provide DOL with a detailed statement of its temporary need. This must be signed by the employer on the employer's letterhead and must include evidence and documentation that supports the category of temporary need (i.e., seasonal, peak load, one-time occurrence, or intermittent).[4]  The H-2B employer is required to justify the specific number of workers needed for the temporary period.

---

[3] For example, an employer can request DOL certification for twenty room attendants for a temporary period of eight months.  DOL will review the employer's recruitment results and will reduce the number of workers certified for that employer by the number of United States workers hired.

[4] For example, in order to establish a peak-load need, the employer must establish that: 1) it regularly employs permanent workers to perform the work at the designated place of employment, and the employer needs to supplement its permanent staff on a temporary basis due to a seasonal or short-term demand; and 2) the temporary foreign workers will not become a part of the employer's regular operation.

(37)   The ETA Application and supporting documentation is then reviewed and adjudicated by DOL. If DOL certifies the ETA Application, it provides the employer with an original certification stamp containing the signature of the certifying DOL officer and a final determination letter.

(38)   The next step in the H-2B visa process requires the employer to file a petition with CIS.  The employer must submit a final determination letter to DOL, and a certified ETA Application to CIS with the Petition for Nonimmigrant Worker (I-129).

(39)   On the I-129 petition, the employer certifies that the petition and all evidence contained are true and correct.  The employer certifies that it will comply with the terms of the certified ETA Application, and must again specify the job in which the alien worker(s) will be employed, the location(s) where the work will be performed, the wages to be paid, the current number of employees for the petitioning employer, and the employer's gross and net annual income.  The I-129 petition will also contain the number of H-2B foreign workers the employer seeks to employ.

(40)   If CIS approves the I-129 petition, a CIS employee notes the approval on the original I-129 petition, and designates the number of H-2B temporary foreign worker positions approved on the I-129. The prospective employer is then notified by letter that the I-129 petition has been approved. If CIS approves the I-129 petition, a Notice of Action (I-797) will be generated.  A copy is sent to the employer and the appropriate United States Embassy as appropriate.

(41)   Foreign nationals seeking to enter the United States as H-2B temporary workers are required to complete an Application for a Nonimmigrant Visa (DS-156). The foreign national must submit the DS-156 form to the United States Embassy, or United

States Consulate, in the country from which they are applying.

(42)   Once the appropriate United States Embassy or Consulate receives the approved I-797 from CIS, DOS will issue H-2B visas to qualified foreign nationals.

(43)   As stated previously, if a foreign national seeks to change employers when their current H-2B expires, the new employer must request new certification from DOL. If DOL certifies the ETA Application, the new employer must file an I-129 petition with CIS providing the names of all H-2B beneficiaries.

(44)   Once the foreign national receives an H-2B visa, s/he is permitted to apply for entry into the United States to work exclusively and solely for the petitioning employer. The foreign national is not authorized to work for any other employer, nor is s/he authorized to work at any other location(s) other than the location(s) certified by DOL and approved by CIS.

(45)   Employers are also required to submit reports to the DOL regarding their recruitment efforts, which include the name and contact information of each United States worker who applied or was referred the job, the disposition of each worker (including any applicable laid-off workers), and the legitimate job-related reason(s) for not hiring the United States worker(s). The employer must maintain the recruitment effort records for three years for DOL's review and audit.[5]   See Rule, 20 C.F.R. § 655.23(b).

---

[5] The employer is required to keep any "supporting documents" demonstrating temporary need for three years from the date of certification in case of a post certification audit. Supporting evidence is not defined by the regulations, but DOL has historically considered charts of permanent and temporary employees, payroll records, and signed contracts setting forth the dates of employment to demonstrate temporary need.

## V.  INVESTIGATION

### a.    Orlando Investigation

(46)    On or about January 2009, ICE Orlando agents were contacted by several foreign nationals who wanted to lodge a complaint against VR Services, a labor staffing company that supplied workers to numerous hotels throughout the United States including Orlando, Florida.  These individuals explained that over forty foreign nationals had individually paid VR Services $750 in order to be placed on a "Change of Employer" petition so as to receive a new H-2B nonimmigrant visa.  These individuals did not receive their visas and contacted ICE at the suggestion of their immigration attorney.

(47)    In February 2009, four of the individuals were interviewed regarding their knowledge of VR High Quality, TWSO, CD Quality, Fourth Millennium, Crystal Diamond, MLE, EPCO, and WB Improvements.  As a result of the interviews, all four sources of information stated that the aforementioned companies were essentially the same entity, interchangeably operating as one company under a larger umbrella conglomerate commonly known to its employees and clients as VR Services.

(48)    Your affiant learned that all four sources had entered the United States using H-2B nonimmigrant visas that were filed by companies other than VR Services. However, each of the four sources' H-2B visas has been renewed by VR Services.  At that time, all four sources' were awaiting the approval of a new H-2B visa petition (also filed by VR Services).  Additionally, one of these individuals is currently working for VR Services at a hotel in the Central Florida area without H2B authorization.

(49)    Your affiant received numerous documents from the four cooperating sources, including payroll checks that were issued by EPCO and Fourth Millennium,

Immigration Forms I-94's showing visas obtained to work for Fourth Millennium and WB Improvements, and business cards showing ownership, management staff, and addresses for TWSO, Fourth Millennium and VR Services.

(50)   Based upon the information received, your affiant initiated an investigation into VR Services.  As a result, your affiant learned that on or about June 15, 2009, an ETA-9142 application, case number C-0916845250, was submitted by CD Quality to DOL requesting certification for 80 room attendant positions.  This application listed TWSO as the named intermediary (or "in care of" recipient) for any correspondence related to the application.

(51)   Appendix B.1 of the ETA-9142 application, case number C-0916845250, contains the signature of V. Barbugli, who signed under penalty of perjury that the ETA Application is true and correct, and includes a declaration that all worksites are listed on the ETA Application and no payments of any kind were sought or received from the employees for any activity relating to obtaining the labor certification.  In addition, V. Barbugli, as the employer, further attested that the job opportunity was open to any qualified United States worker.

(52)   On June 23, 2009, DOL sent a letter to CD Quality requesting additional information from the company because CD Quality failed to comply with all the requirements of the H-2B program.  The deficiencies cited by DOL included deficiencies for the following: CD Quality failed to submit supporting evidence and documentation that justified a temporary need.  CD Quality was advised that its response had to include, but not be limited to, the following:

    i. Signed work contracts, letters of intent from its clients and summarized monthly payroll reports for a minimum of one previous calendar year. Such documentation to be signed by the employer attesting that the information being presented was compiled from the employer's actual accounting records.

    ii. If the employer was a job contractor, it will not place any H-2B workers with any other employers or at other employer's worksite. The employer must submit evidence that the worksite is located at the address indicated on the ETA Application.

(53)   In response to DOL's request for additional information, CD Quality submitted a summarized monthly payroll report for years 2008 and 2009. This document was signed by V. Barbugli, Vice President of CD Quality. In addition, V. Barbugli listed two clients in its response with the following worksite locations: 1) the Seralago Hotel and Suites, located in Kissimmee, Florida; and 2) the Sheraton Safari Hotel and Suites, located in Orlando, Florida.

(54)   Your affiant obtained and analyzed the employer's quarterly wage reports,[6] which were filed by CD Quality with the Florida Department of Revenue for the years 2008 and 2009.

(55)   The monthly payroll report signed by V. Barbugli certified that the information contained in the monthly payroll report was accurate based upon the payroll records maintained by CD Quality. The total number of employees reported on the monthly payroll report submitted to DOL covering the second, third, and fourth quarters of 2008 averaged more than 300 employees with $3,413,923 in total wage earnings received. The total number of employees reported by CD Quality to the Florida

---

[6]   An employer is required to report the name and social security number of each employee, the number of employees and the wages paid to each employee during each quarterly reporting period. The employer is also required to pay a tax to the State of Florida which goes into a fund that compensates workers who become unemployed.

Department of Revenue for the second, third, and fourth quarters of 2008 was "three" with $138,511.39 in total wage earnings received.   The information provided to the Florida Department of Revenue is inconsistent with information provided to DOL for the same timeframe.

(56)   On July 1, 2009, based on the ETA Application and supporting documentation provided by CD Quality, DOL partially certified CD Quality for 77 room attendants for the temporary period of July 15, 2009, through April 30, 2010.   The reduced number of positions certified was due to CD Quality's recruitment report, which had indicated its successful recruitment of three United States workers.

(57)   On August 3, 2009, CIS received an I-129 petition from CD Quality requesting the approval of 58 H-2B workers utilizing the above-referenced certified ETA Application.   This I-129 petition was mailed to CIS by CD Quality.   The petition was assigned file number EAC0921550696 by CIS.

(58)   Contained within EAC0921550696 was a Notice of Entry of Appearance as Attorney or Representative (Immigration Form G-28) from TWSO signed by Toro that stated that TWSO was the recruiting agency who located the H-2B workers for this petition. The Form I-129 was signed by V. Barbugli stating under penalty of perjury that everything contained within the petition was true and correct.

(59)   Also contained within EAC0921550696 was CD Quality's statement that it employed 190 full-time workers and that it needed 58 temporary workers based on its clients' need for additional workers during the peak-load season. The I-129 petition was approved by CIS on August 6, 2009, for 58 H-2B workers and was valid through April 30, 2010.

### b.   Cooperating Sources in Orlando

(60)   In August 2009, your affiant met with a cooperating source (CS-1), one of the sources of information discussed above, who wanted to provide the government information regarding VR Services.   CS-1 is a citizen and national of the Philippines who entered the United States in 2007 as an H-2B visa holder based on a petition filed by a company other than VR Services.   After CS-1's initial entry, s/he was employed by VR Services and s/he utilized the conglomerate to renew his/her H-2B visa(s).   VR Services subsequently petitioned for CS-1 on four H-2B "Change of Employer" petitions for WB Improvements, Fourth Millennium, MLE, and most recently by CD Quality.

(61)   The petitions for WB Improvements and Fourth Millennium were approved; however, the MLE petition that CS-1 was placed on by VR Services was subsequently withdrawn, which caused CS-1 to be out-of-status in the United States. CS-1 was out-of-status and unauthorized to work in the United States from August 15, 2008, until April 15, 2009, when s/he received the approval for an H-2B visa under the company CD Quality.   CS-1 was continuously employed by VR Services at various hotels throughout the Central Florida area from approximately July 2007 through December 2009 (none of which were locations where s/he was supposed to be working in accordance with his/her approved H-2B visa).   Additionally, CS-1 continued to be employed with VR Services even after s/he had been out of status and unauthorized to work in the United States.

(62)   On July 28, 2009, CS-1 went to VR Services and paid $550 to be placed on a new H-2B visa petition to be filed by VR Services. Through checks of ICE indices, your affiant discovered the approved I-129 petition containing CS-1 as an H-2B

beneficiary. After a review of documents, it was learned that the current petition was based on the certified ETA Application, case number C-0916845250, for 77 room attendants to be employed by CD Quality for individuals to work at either the Seralago or the Sheraton Safari hotels. CS-1 confirmed that CD Quality is essentially the same company as WB Improvements, Fourth Millennium and MLE (his/her previous H-2B employers). CS-1 further explained that each of these subsidiary companies are managed and operated by the same individuals, and that the companies are part of a collection of companies that make up VR Services. CS-1 also explained that his/her employment has not changed since s/he received a new H-2B visa under the new employer name CD Quality, and that s/he has worked at the same hotel the entire time.

(63)    CS-1's most recent checks are made out to him/her by a company named Ocean Star. CS-1 stated that Ocean Star is a newly formed company under the umbrella of VR Services. CS-1 stated that s/he is not working (nor has s/he ever worked) at the Seralago or the Sheraton Safari hotels, which are the worksites that are certified by DOL on the ETA application and approved by CIS on the I-129 for H-2B workers associated with his/her petition.

(64)    On October 1, 2009, your affiant interviewed CS-2. CS-2 responded to a job recruitment advertisement placed by CD Quality for room attendant positions. As stated above, the recruitment of United States workers is a requirement in the ETA Application process. CS-2 explained that s/he is a United States Citizen who was unemployed at the time s/he contacted CD Quality for employment. CS-2 stated that s/he faxed his/her resume and was given an interview in June 2009. CS-2 informed your affiant that s/he was not offered a job with CD Quality until two to three weeks after

his/her interview.  CS-2 explained that CD Quality informed him/her that the position would be for a combination of full-time and part-time work, and that s/he would be employed as an "independent contractor."  CS-2 was also told that s/he would not receive an initial paycheck until after s/he worked for an entire month.  CS-2 stated that s/he ultimately turned down the position because s/he had already found employment elsewhere.  Accordingly, CS-2 was not hired by CD Quality.

(65)   V. Barbugli submitted a recruitment report to DOL dated June 15, 2009, in support of the ETA-9142 application, case number C-0916845250.  In this recruitment report, V. Barbugli falsely represented that CD Quality had both interviewed and hired CS-2 to fill one of its available positions so as to fraudulently show that CD Quality was hiring United States citizen workers.

(66)   Appendix B.1 of the ETA-9142 application, case number C-0916845250, contains the signature of V. Barbugli, who signed under penalty of perjury that the ETA Application is true and correct, and includes a declaration that the job opportunity was open to any qualified United States worker.

(67)   On or about August 2009, your affiant met with CS-3, one of the sources of information discussed above, who wanted to provide the Government information regarding VR Services.  CS-3 is a citizen and national of the Philippines who entered the United States in 2007 as an H-2B visa holder based on a petition filed by a company other than VR Services.  After CS-3's initial entry, s/he was employed by VR Services and s/he utilized the conglomerate to renew his/her H-2B visa(s).  VR Services subsequently petitioned for CS-3 on three H-2B "Change of Employer" petitions for WB Improvements, Fourth Millennium and MLE.

22

(68)    The H-2B visa petitions filed by WB Improvements and Fourth Millennium were approved; however, the MLE petition that included CS-3 was subsequently withdrawn, which in turn caused CS-3 to be out-of-status in the United States. CS-3 has been out-of-status and unauthorized to work in the United States since August 15, 2008. Despite this, CS-3 was employed by VR Services, from the time period of 2007 to approximately November 2008, and worked at various hotels in the Central Florida area (none of which corresponded with the locations in his/her approved H-2B visa).

(69)    When an H-2B employer provides material false misrepresentations on the ETA Applications and subsequent CIS petitions, such as requesting more workers than are needed by their clients, employing H-2B alien workers at worksite locations other than those certified by DOL and approved by CIS and filing applications as a "new employer" under a shell company name for the purpose of concealing its identity to DOL and CIS, the employer is in violation of 18 U.S.C. § 1546, as well as other federal criminal statutes.

c.    *Confidential Informant*

(70)    On or about February 2009, your affiant met with a confidential informant CI-1. CI-1 is a citizen and national of the Philippines who entered the United States in 2006 based on an H-2B visa filed by a company other than VR Services.

(71)    On or about May 25, 2007, CI-1 went to VR Services with an interest in renewing his/her original H-2B visa. CI-1 was given a document by VR Services' management staff, which listed the requirements that s/he would need to fulfill in order to be placed on an H-2B visa petition for a VR Services' company. This document was typed on TWSO/WB Improvements' letterhead, and stated that the form was for H-2B

Renewals/Extensions/Rollovers.   This document further indicated that TWSO/WB Improvements had received labor certification by DOL and that it was able to proceed with the filing of an I-129 petition with CIS.  It also stated that anyone approved on that petition would be extended as an H-2B visa beneficiary for WB Improvements until November 30, 2007.

(72)   Also included on that specific document were the required fees and payment information for the new visas.  TWSO/WB Improvements claimed that the attorney fee for filing the H-2B renewal request was $835.  VR Services claimed that the fee was inclusive of all filing fees, the I-129 form, the attorney costs and the premium process to expedite the adjudication process.  This pamphlet stated that all payments should be made to Work World Wide, Regions Bank, account #xxxxxx9271.

(73)   On June 15, 2007, CI-1 went to VR Services to pay for the renewal H-2B visa.  At that time, CI-1 acknowledged receipt of a letter written by V. Barbugli that stated: "I, Valeria Barbugli, have received the amount $750 in cash from [CI-1] for the rollover of [his/her] H-2B visa." This letter was dated June 15, 2007, and signed by both CI-1 and V. Barbugli.

(74)   In August 2007, CI-1 received a new H-2B visa based on an I-129 petition stating that CI-1 had changed employers to work for WB Improvements.  This H-2B petition was submitted to CIS by E. Barbugli, and was approved with a validity period of August 29, 2007, to November 30, 2007.

(75)   When the visa for WB Improvements was about to expire, CI-1 returned to VR Services to be placed on another H-2B visa petition.  The new petition stated that CI-1 was changing employers to Fourth Millennium.  This H-2B petition was also

24

submitted to CIS by E. Barbugli, and was approved with a validity period of December 7, 2007, to August 15, 2008.

(76)    Prior to this most recent visa's expiration, CI-1 went to VR Services once again, and was placed on yet another H-2B petition.  This time CI-1 was placed on an H-2B visa petition stating that s/he was changing to employer MLE, also a VR Services subsidiary. This H-2B petition was submitted to CIS by Astrauskas, and was ultimately withdrawn by VR Services on a later date.  This withdrawal caused CI-1 to be out-of-status in the United States. More specifically, CI-1 became out-of-status and no longer authorized to work in the United States at the expiration of his/her last approved H-2B visa, which was August 15, 2008.

(77)    After CI-1's Fourth Millennium visa expired, VR Services continued to employ him/her.  CI-1 informed your affiant that while s/he was out of status, s/he continued to work at the Westin Imagine Hotel in Orlando, Florida, at the direction of VR Services.

(78)    CI-1 provided your affiant with paychecks that s/he received from VR Services after s/he was no longer authorized to work in the United States.  CI-1 told your affiant that s/he would go to the VR Services' office to pick up his/her checks.

### d.     The Vast Majority of VR Services' Contract Laborers Were Not Present in the United States Legally

(79)    Various database checks, to include ICE indices, were also conducted on a sampling of VR Services' employees who were contracted to work at each client hotel listed below.  These checks were conducted to determine the employees' immigration status and their authority to work in the United States.

(80)    Through the analysis of documents obtained to-date and records checks conducted from the above-referenced sampling, it was revealed that approximately 97 percent of sampled VR Services' employees contracted to work at its client hotels were foreign nationals not authorized to work in the United States.  More specifically, it was revealed that the employees who make up the 97 percent were either in the United States illegally without proper immigration documents or they were working in a place other than that specified on their nonimmigrant visa, all in violation of immigration laws and regulations.

(81)    Additionally, through documents seized pursuant to a federal search warrant executed in December 2009, it was discovered that VR Services was aware that a number of its contract laborers were using social security numbers that were not valid or were not associated with its employees' names.  Documents recovered from the search indicate that VR Services conducted its own record checks to verify its employees' social security numbers on the Social Security Administration's Business Services Online website.  The results of VR Services' own verification checks showed that the overwhelming majority of the social security numbers associated with its employees returned as "Failed" and had associated failed verification codes of either 1 or 5.[7]  Accordingly, agents believe that VR Services was aware that a number of its contract laborers were using social security numbers that were not valid or were not associated with their employees' names.

---

[7] As specifically outlined in the Social Security Number Verification Service Handbook, a "Failed" verification code of 1 indicates that the social security number is not on file (social security number was never issued) and a "Failed" verification code of 5 indicates that the name does not match the true name associated with that specific number.

## VI. TRACING OF FUNDS SOUGHT FOR SEIZURE[8]

### a.   *Contents of Financial Accounts*

(82)   Financial bank account analysis indicates that from January 2007 through August 2009, VR Services' clients (including hotels and other service industry businesses) paid its various shell subsidiary companies by check for the labor provided by VR Services.   Upon receipt, a VR Services' representative would deposit the check into one of the three following accounts: 1) CD Quality's BOA Account; 2) CD Quality's SunTrust Account; 3) Very Reliable's SunTrust Account).[9]   As will be discussed more fully below, instead of paying its labor staff from one of these three accounts, VR Services would transfer the funds it received from its hotel clients to other VR Services' subsidiary accounts so that its labor staff could get paid from one of the other subsidiary accounts.   The three accounts appear to be "catch-all" accounts, and also appear to be used by VR Services solely for the purpose of facilitating payment of VR Services' labor staff and/or moving money for VR Services' various shell subsidiary companies.

### 1.   *Approximately $61,129.34 from Bank of America Account #005488383577 held in the name of* CD Quality *Service Corp.*

(83)   Bank of America Business Checking Account #005488383577 held in the name of CD Quality Service Corp. (CD Quality's BOA Account) was opened at a branch located in Orlando, Florida on February 3, 2004.   The signor on the account is listed as

---

[8]  Pursuant to 18 U.S.C. § 984, in any forfeiture action *in rem* in which the subject property is funds deposited in an account in a financial institution, any identical property found in the same account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture to the extent the funds involved in the offense were located in the year proceeding the seizure.  18 U.S.C. § 984.

[9]  It should be noted that labor staffing is the only service VR Services provides. Accordingly, all profits derived by its subsidiary companies results from labor staffing services provided.

Dozzi, as President of CD Quality.

(84)   From January through April 2009,[10] CD Quality's BOA Account had approximately $3,000,000 in deposits.   Based upon an analysis of the deposits items into this account, approximately $2,400,000 came directly from VR Services' various hotel clients.   The remaining deposits came from other VR Services' shell subsidiary companies' financial accounts.[11]   Based upon my background and expertise, these transactions appear highly unusual because funds are being moved between the below-referenced accounts into CD Quality's BOA Account for no apparent business purpose. These deposits are as follows:

    a.    approximately $161,000 from CD Quality's SunTrust Account;

    b.    approximately $3,400 from Crystal Diamond's BOA Account;

    c.    approximately $1,000 from EPCO'S WaMu Account;

    d.    approximately $125,000 from Fourth Millennium's WaMu Account;[12]

    e.    approximately $26,000 from Fourth Millennium's BOA Account;

    f.    approximately $231,000 from Very Reliable's SunTrust Account; and

    g.    approximately $57,000 from V. Barbugli's BOA Account #003447593517 (not discussed in this affidavit).

On or about December 7, 2009, the remaining funds in this account, totaling $61,129.34, were seized by your affiant.

---

[10] At the time of the writing of this affidavit, agents had only obtained bank statements, deposit items and withdrawal items for this account through April 30, 2009.

[11] These accounts will be discussed more fully below.   These accounts appear to be funded entirely from VR Services' client hotels and/or from other VR Services' accounts that have received funds from VR Services' client hotels.

[12] This account was utilized by VR Services as a payroll account; however it was closed on June 30, 2009.

## 2. Approximately $38,260.84 from SunTrust Account #1000064295107 held in the name of CD Quality Service Corp.

(85)   SunTrust Business Checking Account #1000064295107 held in the name of CD Quality Service Corp (CD Quality's SunTrust Account) was opened on June 13, 2008, at a branch in Orlando, Florida.   The signor on the account is listed as Dozzi, as President of CD Quality.

(86)   From January 2009 through May 2009,[13] CD Quality's SunTrust Account had approximately $1,100,000 in deposits. Of these deposits, approximately $630,000 came directly from VR Services' various hotel clients.   The remaining deposits came from other VR Services' shell companies' financial accounts.   Based upon my background and expertise, these transactions appear highly unusual because funds are being moved between the below-referenced accounts into CD Quality's SunTrust Account for no apparent business purpose.  These deposits are as follows:

a.    approximately $454,000 from CD Quality's BOA Account; and

b.    approximately $17,000 from Fourth Millennium's WaMu Account.

On or about December 7, 2009, the remaining funds in this account, totaling $38,260.84, were seized by your affiant.

## 3. Approximately $32,282.66 from SunTrust Account #1000058721050 held in the name of Very Reliable Services

(87)   SunTrust Business Checking Account #1000058721050 held in the name of Very Reliable Services (Very Reliable's SunTrust Account) was opened on April 2, 2007, at a branch located in Orlando, Florida.   The signors on the account are listed as E. Barbugli, Director of Very Reliable and V. Barbugli, President of Very Reliable.

---

[13] At the time of the writing of this affidavit, agents have only obtained bank statements, deposit items and withdrawal items for this account through May 31, 2009.

(88)    From January 2009 through May 2009,[14] Very Reliable's SunTrust Account had approximately $1,500,000 in deposits.  Of these deposits, approximately $1,250,000 came directly from VR Services' various hotel clients.  The remaining deposits came from other VR Services' shell companies' financial accounts.  Based upon my background and expertise, these transactions appear highly unusual because funds are being moved between the below-referenced accounts into Very Reliable's SunTrust Account for no apparent business purpose.  These deposits are as follows:

    a.    approximately $245,000 from CD Quality's BOA Account; and

    b.    approximately $3,000 from Fourth Millennium's BOA Account.

On or about December 7, 2009, the remaining funds in this account, totaling $32,282.66, were seized by your affiant.

(89)    Based upon an analysis of bank records, a review of documents provided by cooperating sources and a review of QuickBooks records recovered from the search of VR Services' office, the following four accounts are believed to be utilized by VR Services' as payroll accounts: 1) EPCO'S WaMu Account, 2) Crystal Diamond's BOA Account, 3) Fourth Millennium's BOA Account, 4) Ocean Star's BOA Account.[15]  While agents have obtained bank statements for these accounts, specific deposit and withdrawal items have generally not yet been received.  However, based upon a review of the account statements and the QuickBooks records from VR Services' computers, it

---

[14] At the time of the writing of this affidavit, agents had only obtained bank statements, deposit items and withdrawal items for this account through May 31, 2009.

[15] Based upon a review of the evidence thus far, it does not appear that TWSO's BOA Account is utilized for payroll, but it does receive monies from aliens to renew their H-2B renewals.

appears that the only money coming into these accounts are from the catch-all accounts, VR Services' hotel clients and/or other VR Services' accounts mentioned in this affidavit.

**4.      Approximately $672.26 from Washington Mutual Account #3140833943 held in the name of EPCO People Employment Corp.**

(90)    Washington Mutual Business Checking Account #3140833943 held in the name of EPCO People Employment Corp. (EPCO's WaMu Account) was opened on February 20, 2008, at a branch in Orlando, Florida.  Dozzi is listed as the sole signor on the account.  From January 2009 through April 2009,[16] this account had approximately $500,000 in deposits and $500,000 in withdrawals.  Based upon an analysis of other accounts controlled by VR Services, it was determined that at least $430,000 was deposited into this account from CD Quality's BOA Account and CD Quality's SunTrust Account.  On or about December 7, 2009, the remaining funds in this account, totaling $672.26, were seized by your affiant.

(91)    Based upon the large number of checks withdrawn from this account, the dollar amount of the checks, and a review of payroll checks obtained from CI-1 and CS-1, your affiant believes that this account was utilized by VR Services as a payroll account for its employees.  Specifically, CI-1's paychecks reflect that s/he was paid by EPCO's WaMu Account from October 15, 2008, to October 28, 2008.  Paychecks for CS-1 show that s/he was paid from this account from August 27, 2008, through October 28, 2008; and again from December 28, 2008, through January 6, 2009.[17]  Finally,

---

[16] At the time of writing this affidavit, agents have only received bank statements for this account through April 2009.  Specific withdrawal and deposit items have not yet been obtained.
[17] During this time, CS-2 was illegally present in the United States and not authorized

paychecks for CS-3 show that s/he was paid from this account from September 3, 2008, to September 23, 2008. Additionally, VR Services' QuickBooks records indicate that its own employee earnings records for 2009 have EPCO's WaMu Account being used as a payroll account for approximately 276 employees. After reviewing VR Services' other accounts, it does not appear that any funds were withdrawn from EPCO's WaMu Account to fund the other VR Services' accounts.

5.   **Approximately $1,118.88 from Bank of America Account #008981379315 held in the name of Crystal Diamond, Inc.**

(92)   Bank of America Business Checking Account #008981379315 held in the name of Crystal Diamond, Inc. (Crystal Diamond's BOA Account) was opened on January 18, 2007, at a branch in Orlando, Florida. Maria Eugenio, President of Crystal Diamond, is the only signor listed on the account. From January 2009 through May 2009, this account had $1,900,000 in deposits and $1,700,000 in withdrawals.[18] Based upon an analysis of other accounts controlled by VR Services, it was determined that at least $1,000,000 was deposited into this account from CD Quality's BOA Account, CD Quality's SunTrust Account and VR Services' SunTrust Account. Additionally, this account received $28,000 in deposits from Ocean Star's BOA Account #898035614204 (Ocean Star's BOA Account).[19] On or about December 7, 2009, the remaining funds in this account, totaling $1,118.88, were seized by your affiant.

---

to work.

[18] At the time of writing this affidavit, agents have only received bank statements for this account through May 2009. Specific withdrawal and deposit items have not yet been obtained.

[19]   As will be discussed below, based on specific deposit and withdrawal items received from Ocean Star's BOA Account, account analysis suggests that that this account is almost entirely funded by VR Services' hotel clients and other shell companies controlled by VR Services.

(93)   Based upon the large number of checks withdrawn from this account, the dollar amount of the checks, and the review of payroll checks obtained from CI-1 and CS-1, your affiant believes that this account was utilized VR Services as a payroll account for its employees.   Specifically, CI-1 was paid from Crystal Diamond's BOA Account from April 8, 2009, to April 21, 2009, and from May 20, 2009 to June 23, 2009. At the time CI-1 received these paychecks, s/he was in the United States on an H-2B visa that was filed by E. Barbugli, President of Fourth Millennium.[20]   Paychecks for CS-1 show that s/he was paid from this account from April 15, 2009 through April 21, 2009, and from May 20, 2009, through June 16, 2009.[21]   Additionally, VR Services' QuickBooks records indicate that Crystal Diamond's BOA Account was used as a payroll account for approximately 1000 employees classified as 1099's (independent contractors).

### 6.   Approximately $902.68 from Bank of America Account #898031171372 held in the name of Fourth Millennium Corp.

(94)   Bank of America Business Checking Account #898031171372 held in the name of Fourth Millennium (Fourth Millennium's BOA Account) was opened on March 3, 2009, at a branch in Orlando, Florida.   The signor on this account is listed as E. Barbugli, President of Fourth Millennium.[22]   In April 2009, this account had approximately $190,000 in deposits and $179,000 in withdrawals.   Of the deposits,

---

[20] According to the documents submitted in support of the approval of CI-1's H-2B visa, s/he was to be working at either the Orlando Vista Hotel or the Point Orlando Hotel during this time.  However, CI-1 advised agents that s/he had been assigned to work at the Gaylord Palms Hotel by VR Services.

[21] At the time CS-2 received these paychecks, s/he was in the United States on the same H-2B visa as CI-1, which was filed for CS-2 by E. Barbugli so that CS-2 could work for Fourth Millennium.

[22] At the time of the writing of this affidavit, agents have only received bank statements from March 2009 through April 2009, and the deposit items for April 2009.

approximately $165,000 came from the various hotel clients that VR Services provides labor to. Additionally, it was determined that approximately $22,000 was deposited into this account by CD Quality's BOA Account and Very Reliable's SunTrust Account.

(95)   The vast majority of the bank withdrawals in this account appear to be payroll checks given the dollar amounts and quantities of the items that are drawn on the account. Additionally, CI-1 provided a paycheck to agents, which indicated CI-1 was paid from this account from April 1, 2009 to April 7, 2009.[23] Additionally, VR Services' QuickBooks records indicate that Fourth Millennium's BOA Account was used as a payroll account for approximately 295 employees. On or about December 7, 2009, the remaining funds in this account, totaling $902.68, were seized by your affiant.

### 7.   Approximately $36,661.58 from Bank of America Account #898035614204 held in the name of Ocean Star Services

(96)   Bank of America Business Checking Account #898035614204 held in the name of Ocean Star Services (Ocean Star's BOA Account) was opened on June 24, 2009 in Orlando, Florida.[24] The signor on the account is listed as Fernando Aguiar.[25] Between July 2009 and August 2009,[26] this account received approximately $520,000 in

---

[23] At the time CI-1 received this paycheck, s/he was in the United States on an H-2B visa filed for him/her by E. Barbugli. According to the documents submitted in support of the approval of CI-1's H-2B visa, s/he was supposed to be working at either the Orlando Vista Hotel or the Point Orlando Hotel. However, CI-1 advised agents that s/he was working for VR Services, and was assigned to work at the Gaylord Palms Hotel. This violated his/her H-2B visa status effectively making him/her illegally present in the United States and not authorized to work.

[24] Based on an analysis of deposited items received by your affiant for Ocean Star's BOA Account, it was discovered that the customer name associated with Ocean Star's BOA Account is CD Quality. Additionally, all of the checks deposited into this account from VR Services' hotel clients were made out to "Crystal Diamond, Inc."

[25] Fernando Aguiar was deported from the United States on August 25, 2009. It is unknown at this time, the extent of his involvement with this investigation.

[26] At the time of the writing of this affidavit, agents have only obtained bank

deposits and $455,000 in withdrawals.  Approximately $67,000 was deposited into this account from VR Services' hotel clients.  Additionally, approximately $452,000 was deposited into this account from CD Quality's BOA Account, Crystal Diamond's BOA Account and CD Quality's SunTrust Account.

(97)   Additional paychecks received from CS-1 indicate that CS-1 was paid by Ocean Star from July 8, 2009, through October 27, 2009.  During this time, CS-1 was in the United States as a beneficiary of an H-2B visa filed by V. Barbugli, President of CD Quality.  According to the documents submitted in support of the approval of CS-1's H-2B visa, s/he was to be working at either the Sheraton Safari Hotel or the Seralago Hotel in Orlando, Florida.  However, CS-1 advised your affiant that during this time period s/he worked for VR Services at the Westin Imagine Hotel.  Based on the aforementioned information, CS-1 was in violation of his/her H-2B visa status making him/her illegally present in the United States and unauthorized to work.

(98)   An analysis of the note section of the withdrawal items from July 2009 through August 2009 indicates that this account was used to pay approximately 500 of Ocean Star's labor staff.  Additionally, VR Services' QuickBooks records indicate that Ocean Star's BOA Account was used as a payroll account for approximately 590 employees.  ICE has conducted record checks on these individuals and has determined that the vast majority of the employees are in the United States illegally and are not authorized to work in the United States.  On or about December 7, 2009, the remaining funds in this account, totaling $36,661.58, were seized by your affiant.

---

statements, deposit items, and withdrawal items for this account from July 14, 2009, through August 10, 2009.

**8.    *Approximately $364.46 from Bank of America Account #898002198957 held in the name of Travel Work Study Overseas***

(99)    Bank of America Business Checking Account #898002198957 held in the name of Travel Work Study Overseas (TWSO's BOA Account) was opened on November 1, 2006, in Orlando, Florida.  The signors on the account are listed as E. Barbugli, Director of TWSO and Astrauskas, President of TWSO.  The deposits into this account for 2009[27] consist mainly of checks from foreign nationals that paid to have their H-2B visas renewed[28] or VR Services' hotel clients.  This was verified by the "Note" portion of the checks deposited into this account which reflected that the checks were for "H-2B renewal."  This account had approximately $22,000 in total deposits from January through April 2009.  On or about December 7, 2009, the remaining funds in this account, totaling $364.46, were seized by your affiant.

**b.    *Pending Payments to VR Services from its Hotel Clients***

(100)    As a result of the federal search warrant discussed above, documentary evidence was obtained identifying more than 100 clients of VR Services who utilize its contract labor.  Agents also recovered detailed invoices from VR Services to its client hotels for the labor VR Services provided to them.  A comprehensive payroll and employee list of VR Services' contract employees was also obtained, which revealed when and where its employees worked.

(101)    Based upon information obtained from the federal search warrant, ICE contacted numerous hotels throughout the United States who were believed to be

---

[27] At the time of this affidavit's writing, agents had only obtained bank statements from January 2007 through April 2009; certain deposit items from January 2008, October 2008 and April 2009; and one withdrawal item from September 2, 2008.

[28] This was verified by the "Note" portion of the checks deposited into this account which reflected that the checks were for "H-2B renewal."

utilizing contract labor from VR Services.   As a result of conversations with management officers within these hotels, it was confirmed that the hotels discussed below were using VR Services' contract laborers.  A number of the hotels voluntarily provided copies of past and current invoices from VR Services, service agreement contracts, contract employee lists and other documentation showing their business relationships with VR Services.

(102) Bank account analysis, an analysis of seized corporate documents from VR Services and information received from client hotels indicate that from January 2007 through December 2009, VR Services provided contract labor to numerous hotels and other service industry businesses throughout the United States.   Throughout its business relationship with its client hotels, VR Services would supply its client hotels with numbered invoices for the contract labor it provided on a weekly basis.   These invoices identified specific locations where VR Services' employees worked, the hours each employee worked and the total amount owed to VR Services from its client hotels for the time period stated.   Once these invoices were received by the client hotels, payments would be made out to one of VR Services' shell companies by the client hotel in accordance with a service contract.

(103) As a result of these investigative efforts, including conversations directly with client hotel representatives, it has been learned that numerous hotels throughout the United States had outstanding balances owed to VR Services.   The outstanding balances owed to VR Services are in direct correlation with the contract labor provided by VR Services to its client hotels, and, as more specifically described above, labor provided by VR Services with a workforce of individuals not authorized to work in the

United States. Therefore, the outstanding balances owed to VR Services from its hotel clients represent proceeds of VR Services' alien smuggling and visa fraud offenses.

### 1.   The Hilton Bonnet Creek Hotel, Orlando, Florida

(104) From approximately October through December 2009, VR Services provided more than fifty invoices to the Hilton Bonnet Creek totaling approximately $435,000.00. These invoices represented labor provided by VR Services for more than 150 employees contracted to work in various departments within the Hilton Bonnet Creek Hotel. As of March 17, 2010, the Hilton Bonnet Creek Hotel had an outstanding payment of approximately $216,482.17 due to VR Services.

### 2.   The Waldorf Astoria, Orlando, Florida

(105) From approximately October through December 2009, VR Services provided approximately fourteen invoices to the Waldorf Astoria Orlando, Florida totaling approximately $75,120.08. These invoices represented labor provided by VR Services for approximately 37 employees contracted to work in various departments within the Waldorf Astoria Hotel. As of March 17, 2010, the Waldorf Astoria Hotel had an outstanding payment of approximately $52,683.32 due to VR Services.

### 3.   The Hilton Walt Disney World Resort, Lake Buena Vista, Florida

(106) From approximately October through December 2009, VR Services provided more than twenty-five invoices to the Hilton Walt Disney World Resort, Lake Buena Vista, Florida totaling approximately $221,263.70. These invoices represented labor provided by VR Services for approximately 75 employees contracted to work in various departments within the Hilton Walt Disney World Resort. As of March 17, 2010,

the Hilton Walt Disney World Resort had an outstanding payment of approximately $75,661.41 due to VR Services.

### 4.   *The Walt Disney World Swan and Dolphin Resort, Lake Buena Vista, Florida*

(107) From approximately October through December 2009, VR Services provided more than twenty invoices to the Walt Disney World Swan and Dolphin Resort, Lake Buena Vista, Florida totaling approximately $179,206.17.   These invoices represented labor provided by VR Services for approximately 105 employees contracted to work in various departments within the Walt Disney World Swan and Dolphin Resort.   As of March 17, 2010, the Walt Disney World Swan and Dolphin Resort had an outstanding payment of approximately $77,259.63 due to VR Services.

### 5.   *The Buena Vista Palace Resort and Spa, Orlando, Florida*

(108) From approximately October through December 2009, VR Services provides at least five invoices to the Buena Vista Palace Resort and Spa, Orlando, Florida totaling approximately $14,594.73.  These invoices represented labor provided by VR Services for approximately 60 employees contracted to work in various departments within the Buena Vista Palace Resort and Spa.  As of March 17, 2010, the Buena Vista Palace Resort and Spa had an outstanding payment of approximately $6,573.11 due to VR Services.

### 6.   *The Gaylord Palms Resort and Convention Center, Kissimmee, Florida*

(109) From approximately October through December 2009, VR Services provided more than sixty-five invoices to the Gaylord Palms Resort and Convention Center totaling approximately $255,181.32.  These invoices represented labor provided

by VR Services for approximately 80 employees contracted to work in various departments within the Gaylord Palms Resort and Convention Center. As of March 17, 2010, the Gaylord Palms Resort and Convention Center had an outstanding payment of approximately $140,371.57 due to VR Services.

### 7. *The Sheraton Safari Hotel and Suites, Lake Buena Vista, Florida*

(110) From approximately October through December 2009, VR Services provided approximately nineteen invoices to the Sheraton Safari Hotel and Suites totaling approximately $54,147.13. These invoices represented labor provided by VR Services for approximately 20 employees contracted to work in various departments within the Sheraton Safari Hotel and Suites. As of March 17, 2010, the Sheraton Safari Hotel and Suites had an outstanding payment of approximately $13,557.14 due to VR Services.

### 8. *The Seralago Hotel and Suites, Kissimmee, Florida*

(111) From approximately October through December 2009, VR Services provided approximately nine invoices to the Seralago Hotel and Suites totaling approximately $30,290.21. These invoices represented labor provided by VR Services for approximately 16 employees contracted to work in various departments within the Seralago Hotel and Suites. As of March 17, 2010, the Seralago Hotel and Suites had an outstanding payment of approximately $25,755.14 due to VR Services.

### 9. *The Sheraton Yankee Trader/Westin Beach Resort, Ft. Lauderdale Florida*

(112) From approximately October through December 2009, VR Services provided approximately twelve invoices to the Sheraton Yankee Trader/Westin Beach Resort totaling approximately $23,551.65. These invoices represented labor provided

by VR Services for approximately twenty-five employees contracted to work in various departments within the Sheraton Yankee Trader/Westin Beach Resort.   As of March 17, 2010, the Sheraton Yankee Trader/Westin Beach Resort had an outstanding payment of approximately $22,293.51 due to VR Services.

### 10.   The Atlantic Hotel, Ft. Lauderdale Florida

(113) From approximately October through December 2009, VR Services provided approximately nineteen invoices to the Atlantic Hotel totaling approximately $12,515.42.   These invoices represented labor provided by VR Services for approximately seven employees contracted to work in various departments within the Atlantic Hotel.  As of March 17, 2010, the Atlantic Hotel had an outstanding payment of approximately $11,099.41 due to VR Services.

### 11.   The Tides Hotel South Beach, Miami Beach, Florida

(114) From approximately October through December 2009, VR Services provided approximately eleven invoices to the Tides Hotel South Beach totaling approximately $8,200.79.  These invoices represented labor provided by VR Services for approximately five employees contracted to work in various departments within the Tides Hotel South Beach.  As of March 17, 2010, the Tides Hotel South Beach had an outstanding payment of approximately $8,200.79 due to VR Services.

### 12.   The Comfort Inn and Suites, Cocoa Beach, Florida

(115) From approximately October through December 2009, VR Services provided at least four invoices to the Comfort Inn and Suites, Cocoa Beach, Florida totaling approximately $22,392.81.  These invoices represented labor provided by VR Services for approximately fifteen employees contracted to work in various departments

within the Comfort Inn and Suites. As of March 17, 2010, the Comfort Inn and Suites had an outstanding payment of approximately $6,935.00 due to VR Services.

### 13.    *The Kalahari Waterpark Resort, Sandusky, Ohio*

(116) From approximately October through December 2009, VR Services provided approximately sixteen invoices to the Kalahari Waterpark Resort totaling approximately $37,828.50. These invoices represented labor provided by VR Services for approximately 40 employees contracted to work in various departments within the Kalahari Waterpark Resort. As of March 17, 2010, the Kalahari Waterpark Resort had an outstanding payment of approximately $8,937.50 due to VR Services.

### 14.    *The Doubletree Hotel Little Rock, Little Rock, Arkansas*

(117) From approximately October through December 2009, VR Services provided at least nine invoices to the Doubletree Hotel Little Rock totaling approximately $21,007.74. These invoices represented labor provided by VR Services for approximately 10 employees contracted to work in various departments within the Doubletree Hotel Little Rock. As of March 30, 2010, the Doubletree Hotel Little Rock had an outstanding payment of approximately $10,738.52 due to VR Services.

## CONCLUSION

Accordingly, based upon the evidence presented in this affidavit, probable cause exists to believe that there is evidence that the contents of the above-referenced financial accounts and the pending payments from the above-referenced hotels to VR Services represent the proceeds of violations of federal law, including, but not limited to: 1) encouraging or inducing aliens to come to, enter, or reside in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv); 2) conspiracy to encourage or induce aliens to

come to, enter, or reside in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I);  3)  aiding and abetting the encouraging or inducing aliens to come to, enter, or reside in the United States, in violation of 8 U.S.C. §  1324(a)(1)(A)(v)(II); 4)  fraud and misuse of visas, permits, and other documents, in violation of 18 U.S.C. § 1546;  and 5) conspiracy, in violation of Title 18, United States Code, Section 371. Accordingly, the payments owed to the above-referenced hotels are subject to forfeiture pursuant to 18 U.S.C. §§ 1324(b) and 981(a)(1)(C).

FURTHER your Affiant sayeth naught.

_____
Special Agent Brian Devine
Immigration and Customs Enforcement

State of Florida
County of Orange

Before me, the undersigned authority personally appeared, Special Agent Brian Devine, who having produced his Immigration and Customs Enforcement credentials as identification and having being duly sworn, deposes and says that the foregoing Affidavit is true to the best of his knowledge, information and belief.  Witness my hand and official seal in the State of Florida, County of Orange this 5th day of May, 2010.

_____
Notary Public
Commission Expires:

CHRISTINE A. AMBURGEY
Commission DD 726400
Expires November 8, 2011
Bonded Thru Troy Fain Insurance 800-385-7019

43